UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

Maurice K. Mason,

    Plaintiff,

  vs.

Federal Express Corporation, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)

3:14-cv-0107 JWS

ORDER AND OPINION

[Re: Motions at dockets 55 and 57]

## I.  MOTIONS PRESENTED

At docket 55 plaintiff Maurice K. Mason ("Mason") moves for judgment after a trial on the record pursuant to Federal Rule of Civil Procedure ("Rule") 52 or, alternatively, summary judgment pursuant to Rule 56.  Defendants Federal Express Corporation, FedEx Trade Networks Transport & Brokerage, Inc., Aetna Life Insurance Company, Federal Express Corporation Short Term Disability Plan, and Federal Express Corporation Long Term Disability Plan (collectively, "Defendants") oppose Mason's motion at docket 58 and cross-move for summary judgment at docket 57. These two filings are supported by a memorandum at docket 59.  Mason replies in support of his motion at docket 66 and opposes Defendants' cross-motion at docket 67. Mason's memorandum in support of these two filings is at docket 64, and his

declaration is at docket 65.  At docket 73 Defendants reply in support of their cross-motion.

Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

While he was employed by defendant FedEx Trade Networks Transport & Brokerage, Inc. ("FedEx Trade") Mason was diagnosed with a rare autoimmune disease known as Stiff Person Syndrome ("SPS").  SPS is "manifested clinically by the continuous isometric contraction of many of the somatic muscles; contractions are usually forceful and painful and most frequently involve the trunk musculature, although limb muscles may be involved."[1]  After defendant Aetna Life Insurance Company ("Aetna") denied his claim for short-term disability benefits, he filed suit under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").[2]  His complaint alleges: (1) wrongful denial of his claim for short-term disability benefits; (2) wrongful refusal to consider his claim for long-term disability benefits; (3) breach of fiduciary duty; and (4) failure to provide requested plan documents.  Although the parties style their cross-motions as summary judgment motions, they would be more accurately described as partial summary judgment motions because they only address the merits of the first of Mason's four causes of action: whether Aetna abused its discretion in denying Mason's short-term disability claim.

Mason argues that Aetna abused its discretion by ignoring objective medical evidence in the record that shows that his SPS and the side effects of his medications prevent him from performing the duties of his former job.  The following is a summary of the evidence in the record.

---

[1]STEDMAN'S MEDICAL DICTIONARY (2014).  *See also* doc. 32-2 at 9.

[2]29 U.S.C. §§ 1001-1461.

## A.    Initial Treatment from Medical Park Family Care

Beginning in early 2008 Mason repeatedly complained about muscle spasms to his primary care physicians at Medical Park Family Care,[3] but the physicians were unable to determine their cause.[4]  For example, Mason saw Dr. James R. Lord on May 8, 2009, complaining of "continuing very unusual symptoms," including "various types of body spasms in the hands, legs, feet"; "some cramping"; swollen joints; and blurred vision.[5]  Dr. Lord stated that Mason's symptoms were "very difficult to explain."[6]

## B.    SPS Diagnosis from the VA

In February 2010 Mason saw neurologist Gregg Meekins, M.D. with the VA Medical Center.  Dr. Meekins noted Mason's lengthy history "of severe spasms affecting hands, feet, torso, etc.," and the multiple medications that Mason was taking "without benefit or intolerable side effects of excessive sedation."[7]  Dr. Meekins ordered laboratory testing, which "came back positive for very high anti-glutamic acid

---

[3]Doc. 32-2 at 122.  *See also* Mason's November 26, 2008 chart note, *id.* at 126 ("This 44-year-old male is having unusual symptoms that continue, which include this type of cramping sensation of his extremities associated with some tremors. . . . .  He is noting increased intensity and frequency recently."); his April 21, 2009 chart note, *id.* at 127 ("[H]as had an increase in his muscle spasm. . . . .  Primarily they are in the hands, forearms, lower legs and feet."); his October 15, 2009 notes, *id.* at 130 ("This 45-year-old male presents with a long history of cramping in the extremities and neck as well.  It has been going on for greater than a year."); his November 11, 2009 notes, *id.* at 132 ("45-year-old male presents for a constant cramping pain in his neck for the past 3-4 days. . . . .  Pain intermittently down both arms, tingling or burning and somewhat painful, associated w/ hand and finger spasms or locking up."); his February 4, 2010 notes, *id.* at 136 ("Chief Complaint: Cramping in stomach, arms, and legs that will not stop, and along with headaches (since Monday)."); his February 12, 2010 notes, *id.* at 138; and his February 15, 2010 notes, *id.* at 140 ("This patient returns with continued spasms of the extremities and cramping with headaches of concern it may have been related to anxiety a full work up has been done with no etiology determined at this time.").

[4]*See, e.g.,* Masons's November 26, 2008 chart note, *id.* at 126 ("Extremity cramping. tremors, and weakness.  The etiology Is not clear."); and his February 4, 2010 note, *id.* at 137 ("Unclear etiology of patent's symptoms . . . .").

[5]*Id.* at 129.

[6]*Id.*

[7]*Id.* at 57.

-3-

decarboxylase ["GAD"] 65 antibody level consistent with the diagnosis of stiff-person's syndrome."[8]  After diagnosing Mason with SPS, he prescribed baclofen to treat Mason's condition.[9]  Although a subsequent laboratory test in July 2010 came back normal,[10] Mason's blood was retested in December 2010 and the results were positive for SPS ("although not as high a level" as the February result).[11]  Defendants do not contest the validity of Mason's SPS diagnosis.

## C. Consult with Neurologist Wayne Downs, M.D.

Mason met with neurologist Wayne Downs, M.D. in April 2010.  Mason described his history of cramping, which he said had gotten gradually worse.[12]  He also explained that he was being treated with several "potentially sedating drugs" which caused a "lack of focus and short-term memory loss."[13]  Mason told Dr. Downs that he was not able to perform his job and in "the last few days he [had] been found asleep at his desk on two occasions."[14]

Dr. Downs assessed Mason as having "anti-GAD65 stiff person syndrome."  As to Mason's lack of focus and memory loss, Dr. Downs stated that Mason's encephalopathy[15] was "worse on his current medications" and suspected that this was because of the baclofen he was taking.  At the time Mason was taking 60 mg of

---

[8]*Id.*

[9]*Id.*

[10]*Id.* at 101.

[11]*Id.* at 108.

[12]*Id.* at 146.

[13]*Id.*

[14]*Id.*

[15]Encephalopathy is a disorder of the brain.  STEDMAN'S MEDICAL DICTIONARY (2014).

baclofen daily.[16]  Dr. Downs wrote that "[w]ere I treating him I would taper the baclofen off relatively rapidly and then start pushing the Valium."[17]  "If we can get him off his sedating medications and he is still having an encephalopathic problem," Dr. Downs wrote, "then I think a neuropsych[ological] test would be indicated to quantitate [sic] this as this may be a source of employment difficulties."[18]

## D.    Follow-Up Treatment

Following his consult with Dr. Downs, Mason returned to Medical Park Family Care complaining about the side effects of his medications.  On May 7, 2010 Dr. Lord ordered Mason to taper off baclofen but stated that he would still "likely need high doses of muscle relaxants for the muscle cramps and stiffness."[19]

On July 8, 2010 Mason saw Dr. Lord again, complaining that his SPS was worsening and that the tapering of the dosage of his muscle relaxants was not helping.[20]  The notes from Dr. Lord's physical examination state that Mason was in "moderate pain/distress" and "[v]isibly uncomfortable, some palpable spasms on chest wall, discomfort with walking and changing positions."[21]

On July 15, 2010, Mason was admitted to the emergency department of Providence Alaska Medical Center, complaining of cramps and muscle spasms with pain that he described as a 10 on a scale of 0 to 10.[22]  The emergency department physician noted that Mason did not appear to be in distress or discomfort despite his

---

[16]Doc. 32-2 at 146.

[17]*Id.* at 148.

[18]*Id.* at 149.

[19]*Id.* at 153.

[20]*Id.* at 163.

[21]*Id.*

[22]*Id.* at 52.

stated pain level, and that he was alert and oriented.  Mason was given morphine and Ativan for his pain and instructed to follow up with his primary care physician.[23]

The next morning Mason met with Dr. Lord, who noted in his physical exam that Mason was suffering from "moderate pain/distress."[24]  Later that day Mason was again admitted to the emergency room complaining of pain.[25]  The emergency department physician noted that Mason's inability to control his SPS-related pain was "unfortunately par for this unfortunate malady," which he described as "ultimately . . . very difficult to treat."[26]

In the following months Mason sought medical treatment repeatedly for his SPS, including the following visits:

- Dr. Lord's July 27, 2010 physical exam notes state that Mason was suffering from "mild pain/distress" and had a "depressed affect."[27] Dr. Lord concluded that Mason's SPS had deteriorated.[28]

- The next day Mason met with Dr. Meekins, complaining of painful spasms and stiffness in his trunk and extremities.  Dr. Meekins described Mason's SPS as "progressive."[29]

---

[23]*Id.* at 53.

[24]*Id.* at 164.

[25]*Id.* at 55.

[26]*Id.*

[27]*Id.* at 168.

[28]*Id.*

[29]*Id.* at 61.

- On August 16, 2010, Dr. Lord again examined Mason, assessed Mason's SPS had deteriorated, and noted that he was suffering from "mild pain/distress" and "[c]ontinued diffuse muscle spasms."[30]

- Dr. Lord examined Mason again on August 25, 2010, and again noted that Mason was suffering from "mild pain/distress" and had a "depressed affect."[31]

- On September 22, 2010, Mason was referred to VA internist Madeleine M. Grant, M.D., who addressed Mason's reports that his medicine was causing him to be too sedated to drive or work.[32] Dr. Grant listed Mason's treatment goal as "find[ing] medication that worked and did not affect him cognitively."[33] She recommended tapering Mason's baclofen usage and gradually increasing diazepam.

- In Dr. Lord's notes to Mason's September 29, 2010 visit, Dr. Lord states that he discussed Mason's SPS with the VA and they agreed to "maximize the dosing of Valium to try and treat his spasms" and "[s]lowly titrate down the baclofen."[34]

- On October 6, 2010, Mason complained to Dr. Lord that his body cramps had "worsened especially the feet and arms since tapering off of the baclofen" but he noticed less sedation.[35]

---

[30] *Id.* at 173.

[31] *Id.* at 175.

[32] *Id.* at 68.

[33] *Id.* at 69.

[34] *Id.* at 181.

[35] *Id.* at 183.

- On October 28, 2010, Dr. Lord again noted that Mason's SPS had deteriorated, he was suffering "moderate pain/distress," and had a "depressed affect."[36]

- On November 15, 2010, Mason complained to Dr. Lord about "pain and discomfort and depression" from SPS. Dr. Lord's physical exam noted that Mason was suffering from "moderate pain/distress" and had a "depressed affect."[37]

- On December 23, 2010, Mason told another Family Park Medical Care physician, Jeffrey Kim, M.D., that he was doing "okay" on Valium but it made him "very sleepy and very poor functioning."[38]

- On January 9, 2011, Mason was admitted to the emergency department at the hospital complaining of severe abdominal pain, which he graded as a 9 on a scale of 0 to 10.[39] The emergency department physician noted that Mason alleviated his pain by taking his medication at home, but within about 20 minutes of presenting himself at the hospital Mason had already fallen asleep.[40]

E.    **Neuropsychological Exam**

Because Mason was complaining of memory decline, Dr. Meekins referred Mason to neuropsychologist Paul D. Dukarm, Ph.D. for testing in September 2010. In his summary of his findings Dr. Dukarm states that Mason was "exhibiting variable neurocognitive performance deficits in the areas of executive functioning. Specifically, he [was] demonstrating impaired performance in the area of visuospatial organization

---

[36]*Id.* at 188.

[37]*Id.* at 190.

[38]*Id.* at 192.

[39]*Id.* at 48.

[40]*Id.* at 49.

and planning during problem solving and impaired response flexibility under changing conditions."[41] In addition, Dr. Dukarm found that Mason was "borderline deficient" with regard to "[d]eductive logic as it relates to attribute identification and concept formation," and he showed "deficiencies for learning and retaining uncontexualized verbal information, such as a word list."[42] Dr. Dukarm noted, however, that Mason's "recognition [was] intact as well as his learning efficiency and retention of other forms of verbal information (prose) and non-verbal information."[43] And although Mason's "[b]asic auditory attention and working memory" were "low average," he was in the average range with regard to "visual working memory," "verbal fluency under time pressure, sequencing and alternating attention under time pressure, and inhibiting automatic responses under time pressure."[44]

Dr. Dukarm concluded that the findings of his exam were "compatible with a diagnosis of Cognitive Disorder, NOS."[45] "Etiology of neurocognitive deficits is unclear and likely multifactorial. . . . . The most likely contributing factors to this patient's performance deficits include medication effects, pain, and sleep disturbance. Other contributing factors include the autoimmune disease of which he is diagnosed, but the cognitive effects are unclear as to the nature and source of the impact from this condition."[46]

---

[41]*Id.* at 77.

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]*Id.*

[46]*Id.* at 77-78.

**F.     Psychotherapy**

On September 1, 2010, Mason was seen by Camilla A. Madden, Ph.D., a psychologist at the VA, who diagnosed Mason with severe depression related to his struggles at work and with his family because of the side effects of his medications and the limitations of his disorder.[47]  Mason continued to see Dr. Madden regularly for treatment of his depression.[48]

**G.     Mason Applies For Short-Term Disability Benefits**

Mason applied for short-term disability benefits in December 2010, stating that he was no longer able to work due to his SPS and described his symptoms as follows: "Muscle spasms all over, cramps all over, dystonia[49] in the hands and feet, chronic fatigue, unable to concentrate and chronic headache."[50]  In order for employees to qualify for short-term disability benefits under the Short Term Disability Plan ("the Plan") administered by defendant Federal Express Corporation ("FedEx"), they must show that they suffer from an "occupational disability," which the Plan defines as "the inability of a Covered Employee, because of a medically-determinable physical impairment or Mental Impairment, to perform the duties of his regular occupation."[51]

---

[47]*Id.* at 64-65.

[48]*See, e.g., id.* at 66-67; 71-72; 79-82; 83-84; 88-89, 90-91; 94-85; 97-98.

[49]Dystonia is defined as "[a] syndrome of abnormal muscle contraction that produces repetitive involuntary twisting movements and abnormal posturing of the neck, trunk, face, and extremities."  STEDMAN'S MEDICAL DICTIONARY (2014).

[50]Doc. 32-3 at 32-33.

[51]*See* the Plan § 1.1(s), doc. 32-6 at 50.  *See also* Doc. 59 at 4.

**H.    Mason's Supervisor States that Mason is Unable to Work**

Mason worked as a manger for FedEx Trade who oversaw a group of 26 employees.[52]  His former supervisor, Linda Combs ("Combs"), wrote an email stating that Mason "would suffer from severe muscle cramping" at work "and his limbs would 'lock up.'"[53]  For example, Combs reported that she had observed Mason not being able to get up from a meeting table "because his legs locked up" and "his hands cramp up and lock where he could not open his hand."[54]  Combs also stated that she saw Mason "fall to the ground with leg spasms at an employee picnic."[55]

Combs stated that Mason started "really declining in the fall of 2009," when he had "spasms much more frequently and more severely."[56]  Mason started taking medication but it was "very sedating," causing him to take most of March and some of April 2010 off from work so that he could "try[] to cope on these medications."[57]  When he returned to work, he "struggled with staying awake and alert through an 8 hour work day," had a bad limp, and experienced difficulty walking around the two-floor office.[58]  Combs reported that Mason had "trouble focusing and remembering things," and "many times" on the job "was falling asleep, slurring his words and making very little sense."[59]  Combs stated that she "would send him things that he didn't ever remember seeing"

---

[52]Doc. 32-2 at 235.

[53]*Id.* at 236.

[54]*Id.*

[55]*Id.*

[56]*Id.*

[57]*Id.* at 237.

[58]*Id.*

[59]*Id.*

and that he "could not keep up with his deadlines."[60]  "I finally told him that this was getting way out of control," Combs wrote.  "We wouldn't allow any other employee to come in and pass out at their desk.  I felt like I was dealing with a situation that presented the company with a grave liability."[61]

Combs' report is consistent with a December 13, 2010 entry in Aetna's claim records which states that Mason's "HR Advisor" called Aetna because she wanted to help Mason with his claim.  The advisor stated that she would "make [Mason] understand" what Aetna needed and would "ask [Mason's] girlfriend to help him, because he is in a lot of pain and many times he is [on] pain medicine and cannot understand what he is being asked."[62]

**I.      Mason's Treating Physicians Opine That He Is Unable to Work**

In June 2010 Dr. Lord filled out a FedEx form indicating that Mason was unable to perform any of his job functions due to his SPS, and his condition was permanent.[63] Dr. Lord elaborated on his opinion in a July 29, 2010 letter, in which he stated that Mason's medical concerns—including "uncontrollable muscle spasms throughout the body, irritable bowel-like symptoms, generalized anxiety and depression, restless legs, circulatory conditions, hypertension, spontaneous tendon ruptures and sleep disorder"—can be attributed to his "definitive diagnosis" of SPS.[64]  Dr. Lord wrote that Mason's "symptoms have progressively worsened and his symptoms are currently

---

[60]*Id.*

[61]*Id.*

[62]Doc. 32-3 at 45.

[63]Doc. 32-2 at 159-62.

[64]*Id.* at 172.

-12-

poorly controlled. He is medically disabled at this time and would benefit from evaluation by a leading expert on stiff person syndrome."[65]

The physician responsible for Mason's primary care shifted from Dr. Lord to Dr. Kim.[66] Dr. Kim wrote a letter on December 23, 2010, stating that Mason's SPS diagnosis had been confirmed by two separate neurologists and rendered him permanently disabled.[67] Dr. Kim also completed an "Attending Physician Statement" on January 21, 2011, that states Mason is unable to work in any capacity due to his disease and the effects of his medications and lists the objective data upon which this opinion relies, including physical exams that reveal spasms in Mason's chest and abdomen and cramps in his extremities, and various diagnostic tests that were performed on Mason that confirm his SPS diagnosis.[68] Dr. Kim expanded on this opinion in the following two notes in Mason's file: (1) on January 21, 2011, Dr. Kim wrote that "[f]or reasons related to medication side effects as well as symptoms associated with his condition, [Mason] is unable to function adequately at work and should certainly be considered disabled;"[69] and (2) on January 26, 2011, Dr. Kim wrote that Mason was "currently, and for the foreseeable future, significantly disabled and unable to function at any effective level in a work capacity."[70]

## J.    Aetna Denies Mason's Claim

Aetna denied Mason's claim on March 28, 2011. In the denial notice Aetna Nurse Consultant Patricia Karns ("Karns") writes that she reviewed Mason's file and

---

[65]*Id.*

[66]Doc. 55 at 11.

[67]Doc. 32-2 at 194.

[68]*Id.* at 198.

[69]*Id.* at 196.

[70]*Id.* at 199.

presented his claim to "an independent peer physicians [sic] specializing in internal medicine, neurology, and neuropsychology." She informs Mason that Aetna determined that "the clinical data received and reviewed fails to support a functional impairment from [Mason's] sedentary occupation."[71]

Aetna did find that some unspecified "data indicates that [Mason was] unable to work related to side effects of [his] medications."[72] "However," Aetna continued, "the office visit notes from Dr. Kim and Dr. Grant do not document any objective findings to indicate a functional impairment such as significant sleepiness or disorientation *during office visits*. The documentation also noted that you are alert and oriented."[73] Aetna also concluded that there was "no documentation of any cognitive impairment"[74] despite the apparent contrary conclusion of Dr. Dukarm, because Dr. Dukarm "did not record any significant sedation *during the interview or testing.*"[75] Aetna also discounted the results of Dr. Dukarm's test that supported a disability finding, stating that "there was no consistency or validity testing results."[76]

Aetna's notice states that Mason needed to submit, among other things, "medical documentation that clearly states the significant objective findings that substantiate a disability."[77] Aetna defined "significant objective findings" as "signs, which are noted on a test or medical exam and are considered significant anatomical, physiological, or psychological abnormalities that can be observed by a practitioner

---

[71]*Id.* at 4.

[72]*Id.*

[73]*Id.* (emphasis added).

[74]*Id.*

[75]*Id.* (emphasis added).

[76]*Id.*

[77]*Id.* at 5.

apart from your description of your symptoms." Aetna provided examples of such data: (1) "[p]hysician exam reports, office notices, progress notes;" (2) "[o]ther Healthcare provider reports;" and (3) "[d]iagnositic test results, i.e. lab tests, radiographic tests."[78] Aetna informed Mason in bold print that "[p]ain, without significant objective findings, is not proof of disability."[79]

Mason appealed on June 24, 2011.[80]

## K.    Mason Submitted Additional Information

Between the date of Aetna's denial and the date Mason filed his appeal, Mason was admitted to the emergency department three times related to SPS spasms: on April 27,[81] May 11,[82] and May 28, 2011.[83] Mason submitted to Aetna the medical records related to these admissions.[84]

On May 23, 2011, the Social Security Administration determined that Mason was disabled under the rules of its disability insurance program ("SSDI").[85] The SSDI program "provides benefits to a person with a disability so severe that she is 'unable to do [her] previous work' and 'cannot . . . engage in any other kind of substantial gainful

---

[78]*Id.*

[79]*Id.* at 4.

[80]Doc. 32-3 at 19.

[81]Doc. 32-2 at 32-39 (Mason was suffering from "still present," severe, "whole body spasms" and listed his pain level at 10 on a scale of 0 to 10).

[82]*Id.* at 22-31 (Mason was taken to the emergency room in an ambulance complaining of whole body muscle spasms and listed his pain level at 10).

[83]*Id.* at 15-21 (Mason had fallen after suffering a spasm in his right leg, and was diagnosed with a left ankle sprain and right quadriceps strain).

[84]*Id.* at 11.

[85]*Id.* at 12.

work which exists in the national economy."[86]  Mason submitted to Aetna his Notice of Award of SSDI benefits.[87]

Mason also submitted to Aetna letters from three of his treating doctors: Dr. Grant, Dr. Downs, and Dr. Madden.  Dr. Grant wrote a letter dated March 3, 2011, stating that it was her opinion that Mason was unable to work on account of his disability "both due to severe discomfort from his stiff man syndrome, and also from side effects of the medication, which affects him cognitively."[88]

Dr. Downs wrote a letter dated June 10, 2011, stating that Mason's "symptoms are consistent with [SPS] and blood work has been positive for the relevant antibodies. The diagnosis is not in question."[89]  Dr. Downs provided Aetna with the following information about SPS:

> The disease is extremely rare and poorly understood.  There seem to be several etiologies, but the final result is significant loss of inhibition of spinal motor neurons which results in extreme excessive firing of these motor neurons and contraction of the innervated muscles.  This is similar to but very much more severe than what is seen in spasticity after a stroke, and the spasms can in fact be severe enough to break bones. Symptoms can sometimes be controlled by medications, but the medications are extremely sedating, and we have as of yet been unable to give [Mason] any significant relief.[90]

In addition, Dr. Downs provided Aetna with a copy of the section from Goetz Textbook of Clinical Neurolgy that discusses SPS and directed its attention to the final section, "Prognosis and Future Perspectives."  That section reads as follows: "Without treatment, SPS progresses to total disability related to generalized rigidity and

---

[86]*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999) (citing § 223(a) of the Social Security Act, as set forth in 42 U.S.C. § 423(d)(2)(A)).

[87]Doc. 32-2 at 11.

[88]*Id.* at 121.

[89]*Id.* at 8.

[90]*Id.*

-16-

secondary musculoskeletal deformities.  The pathogenetic autoimmune mechanisms remain to be elucidated."[91]

Finally, Dr. Madden wrote a letter dated July 13, 2011, in which she describes how the side effects of Mason's medications impair his ability to function.  She notes that Mason's medications make him "very tired to the point of not being able to stay awake while engaged in an appointment.  There have been therapy sessions with me when Mr. Mason has fallen asleep despite a valiant effort to stay awake and to benefit from the therapeutic encounter."[92]  Dr. Madden states that she "repeatedly noted that [Mason's] insight and judgment is good when not impaired due to the effects of medication which alters his cognitive faculties," but "neuropsychological testing has indicated that he has a severe degree of intellectual loss from one and a half years ago when he was still able to function as a manger at Federal Express."[93]  Further, Dr. Madden states that the side effects of Mason's medications "are so serious that Mr. Mason and his wife have frequently told me that he does not take his medication so that he will be able to stay awake and alert enough so that he can communicate, understand and remember what has taken place in a health care appointment or in appointments with other agencies and physicians."[94]

## L.    Aetna's Appeals Committee Upholds the Denial of Mason's Claim

The Plan provides that if an "adverse benefit determination is appealed on the basis of medical judgment, the appeal committee shall consult with an independent health care professional who is qualified in the areas of dispute who shall not have

---

[91]*Id.* at 9.

[92]*Id.* at 13.

[93]*Id.*

[94]*Id.*

been involved in the initial claim denial."[95]  In October 2011 Aetna's Appeals Committee upheld the denial of Mason's claim.  The denial letter states that the Committee reviewed "all appeal information submitted, all medical documentation and the Peer Physician Reviews dated 02/10/11, 02/24/11, 03/07/11, 03/08/11, 03/24/11, 08/06/11, 08/09/11, and 09/14/11."[96]  These Peer Physician Reviews included reviews from the original three specialists in internal medicine, neurology, and neuropsychology, as well as second opinions from three different physicians in those fields.  Based on their review, the Committee concluded that there were "no significant objective findings to substantiate that a functional impairment exists that would render [Mason] unable to perform [his] sedentary job duties as a Tax Analyst from 12/01/10 through current."[97]

**1.  Aetna's Internal Medicine Peer Reviews**

**a.)  Wendy Weinstein, M.D.**

Dr. Weinstein, who is board-certified in internal medicine, submitted a February 11, 2011 Peer Physician Review that states she reviewed various medical reports and concludes that "none of the examination findings by multiple providers have documented abnormalities that would preclude the claimant from performing a sedentary occupation."[98]  Dr. Weinstein submitted a second Peer Physician Review on March 9, 2011, after receiving additional medical reports to review.  In neither of these reviews did Dr. Weinstein engage in a "peer-to-peer consultation" with any of Mason's treating physicians.[99]

With regard to the effects of Mason's SPS, Dr. Weinstein's February 11 report states that Mason was noted to "walk stiffly" at "one point," "but there has been no

---

[95]Doc. 32-6 at 72.

[96]Doc. 32-1 at 1.

[97]*Id.* at 2.

[98]Doc. 32-2 at 260.

[99]*Id.* at 255, 260.

documentation of abnormal muscle tone on specific muscle testing or other musculoskeletal or neurologic examination abnormalities."  She acknowledges that Dr. Meekins diagnosed Mason with SPS in February 2010, but adds that "there was no documentation of any change in the claimant's physical examination and no documentation of specific functional impairments that would preclude the claimant from performing his sedentary occupation as of 12/1/10."[100]  Dr. Weinstein's March 9 report reaches the same conclusion, but adds the fact that on November 15, 2010, Dr. Lord observed Mason in "moderate pain and distress."  Dr. Weinstein discounted this observation, however, because "no details of specific observations were presented."[101]

    With regard to the side effects of Mason's medications, Dr. Weinstein discounts Dr. Dukarm's neuropsychological test's conclusion that Mason was likely suffering from a cognitive defect caused in part by the effects of his medications.  Dr. Weinstein writes that the test's "findings were non-specific and it was noted they could be attributed to medication affects, pain, and sleep disturbance as well as depression."[102]  Although Mason "complained of somnolence from his medications," Dr. Weinstein writes, "there has been no documentation of pathologic hypersomnolence, difficulty with communication in the office visits, or significant cognitive impairments.  Progress notes have described that claimant as alert and intelligent."[103]  Dr. Weinstein was not provided with any of Dr. Madden's records.

    Dr. Weinstein's second review indicates that she was provided with a copy of Dr. Dukram's neuropsychological test and Combs' email.[104]  Despite Dr. Dukram's finding that Mason had a cognitive impairment on September 27, 2010, Dr. Weinstein

---

[100]*Id.* at 255.

[101]*Id.* at 260.

[102]*Id.* at 256.

[103]*Id.*

[104]*Id.* at 258.

-19-

writes that "it appears the claimant was still able to perform his own occupation with the first date of absence being listed as 11/10/10."[105]  (Dr. Weinstein claims that she reviewed all of Mason's records, including Combs' email, before reaching this conclusion).[106]

### b.) Second Opinion From Dennis Mazal, M.D.

Dr. Mazal, who is board certified in pulmonology and internal medicine, submitted an August 8, 2011 Peer Physician Review that states that he cannot "discuss functionality" based on Mason's SPS diagnosis because neurological diagnoses are "not within the scope of [his] specialty."[107]

With regard to the side effects of Mason's medications, Dr. Mazal wrote without further explanation that "[t]here is no documentation that any of those medications caused any clinically significant side effects or adverse reactions that impact the claimant's ability to perform the duties of a sedentary demand occupation during the time period under consideration."[108]  Dr. Mazal did not engage in a peer-to-peer consultation with any of Mason's treating physicians.

### 2. Aetna's Neuropsychology Peer Reviews

### a.) Elana Mendelssohn, Phy.D.

Dr. Mendelssohn, who is board certified in clinical psychology and neuropsychology, submitted a February 24, 2011 Peer Physician Review. Dr. Mendelssohn prefaced her report by noting that most of the records she reviewed pertain to Mason's "physical complaints" related to SPS, and therefore she deferred "to the appropriate medical specialists to determine the impact of [Mason's] medical

---

[105]*Id.* at 260.

[106]*Id.* at 259.

[107]Doc. 32-3 at 1.

[108]*Id.*

-20-

complaints on his functionality."[109]  Dr. Mendelssohn proceeded to evaluate Mason's

neurological complaints in the records she reviewed.  She ultimately concluded that

"clinical documentation does not support a functional impairment that would preclude

[Mason] from performing the essential duties of his own occupation from 12/1/10 to

forward."[110]  Dr. Mendelssohn submitted a second Peer Physician Review on March 7,

2011, after receiving Combs' email to review.  In neither of these reviews did

Dr. Mendelssohn engage in a "peer-to-peer consultation" with any of Mason's treating

physicians.[111]

      With regard to the side effects of Mason's medications, Dr. Mendelssohn noted

that "various treating providers included sporadic reports of [Mason's] emotional and

cognitive difficulties," but discounted this by concluding that none of those providers

"included specific measurements of [Mason's] cognition or a description of direct and

observed behaviors to corroborate the presence of impairment in neuropsychological

functioning."[112]

      Dr. Mendelssohn noted that Dr. Dukarm's neuropsychological exam diagnosed

Mason with a cognitive disorder secondary, in part, to the side effects of his

medications.  But she then offered four reasons for why she discounted the results of

this test: (1) Mason continued to work afterward; (2) "there was no indication that

[Dr. Dukarm] utilized symptom validity measures to ensure adequate effort and

motivation and valid test findings; (3) "office visits just prior to and after the

neuropsychological examination noted that the claimant presented as alert and oriented

with normal attention and concentration;" and (4) "none of [Mason's] providers indicated

---

[109]Doc. 32-2 at 242.

[110]*Id.* at 245.

[111]*Id.* at 245, 249.

[112]*Id.* at 245.

that the claimant was unable to work in relation to his neuropsychological status."[113]
Dr. Mendelssohn made these four findings without the benefit of Dr. Madden's records
or Combs' email.

   After reviewing Combs' email that outlined Mason's problems at work,
Dr. Mendelssohn maintained that Mason had not shown that he is disabled because:
(1) Combs' report of Mason slurring words was not reflected in the documents that she
reviewed previously; (2) although Combs reported that Mason was falling asleep at
work, "there was no indication that [Mason] fell asleep during [Dr. Dukarm's]
evaluation;" (3) "[a]lthough [Dr. Dukarm] noted that [Mason] appeared lethargic, more
specific description was not included;" and (4) there was no indication from Mason's
various office visit notes that he was "falling asleep during his office visits nor did the
provided information include . . . description of overt cognitive difficulties."[114]  Again,
Dr. Mendelssohn lacked Dr. Madden's records when she made these findings.
Dr. Mendelssohn concluded that, although Combs' report indicates "both physical and
cognitive difficulties," "there continues to be a lack of clear and consistent description of
direct and observable behaviors to substantiate the presence of a functional
impairment."[115]

   **b.)     Second Opinion From Leonard Schnur, Phy.D.**

   Dr. Schnur, who is board certified in psychology, submitted an August 9, 2011
Peer Physician Review.  He was provided with Dr. Madden's July 13, 2011 letter.  With
regard to the side effects of Mason's medications, Dr. Schnur's report states that the
documentation he reviewed "referenced possible side effects from [Mason's]
medication regimen for treatment of stiff-man syndrome, which apparently results in
drowsiness, sedation, and reduced concentration and attention."  Dr. Schnur declined

---

[113]*Id.*

[114]*Id.* at 249-50.

[115]*Id.* at 250.

-22-

to comment on how these side effects impact Mason's ability to work, however, stating that Mason's "medication regimen and any adverse medication side effects . . . would go beyond the scope of [his] expertise and should be addressed by the appropriate peer specialty."[116]

### 3. Aetna's Neurology Peer Reviews

#### a.) Vaughn Cohan, M.D.

Dr. Cohan, who is board certified in neurology, submitted a March 26, 2011 Peer Physician Review. After describing the records he reviewed, Dr. Cohan states that "[t]he neuropsychological and neurocognitive aspects of this case would fall outside the scope of general medical neurology" and therefore he deferred to Dr. Mendelssohn regarding those issues.[117]

Dr. Cohan describes a "peer-to-peer consultation" he had with Dr. Kim, who is a family practitioner and not a neurologist, despite noting that Mason's treating neurologists are Dr. Downs and Dr. Meekins.[118] According to Dr. Cohan, Dr. Kim stated that Mason reported "that his cramping diminishes while on medications, but his medications cause him to experience undesirable adverse sedative effect."[119] When Dr. Cohan asked Dr. Kim "about his notes indicating that [Mason] appears in office to be alert and oriented with no evidenced signs of over-sedation[,] Dr. Kim stated that the claimant has reported to him that he does not take his medications prior to office visits so that be may interact with medical provider optimally."[120] According to Dr. Cohan, Dr. Kim stated that he had never observed Mason overly sedated or cognitively

---

[116]Doc. 32-3 at 6.

[117]Doc. 32-2 at 265.

[118]*Id.* at 245, 249.

[119]*Id.* at 265.

[120]*Id.*

-23-

impaired and indicated "that there is no apparent physical impairment that would preclude performance of desk work."[121]

Dr. Cohan relied heavily on Dr. Kim's statements in his report. He states that "[a]lthough there are references to over-sedation in the medical record and as submitted by one of the claimant's coworkers/managers, nevertheless, there is no independent medical verification or substantiation to that effect. When the claimant has been seen medically by medical providers, there has been no report of objective excess sedative or medication effect."[122] (Dr. Cohen was provided with Dr. Madden's records and he claims that he reviewed them.)[123] Dr. Cohen concluded that "the documentation provided fails to demonstrate objective evidence of a functional impairment for the claimant's own sedentary occupation from 12/1/10 to the present."[124]

### b.) Second Opinion From Andrew J. Gordon, M.D.

Dr. Gordon, who is board certified in neurology, submitted an August 11, 2011 Peer Physician Review. Mason asserts that "Dr. Gordon was the only reviewer hired by Aetna that did not appear to be 'in house.' He apparently works for MES."[125] After reviewing Mason's records, including those from Dr. Madden, Dr. Gordon concluded that "there is significant objective clinical documentation that reveals a functional impairment that would preclude [Mason] from performing the essential duties of [his] own occupation which is a sedentary demand level from 12/01/10 through current."[126] He supported this conclusion with the following evidence:

---

[121]*Id.*

[122]*Id.* at 266.

[123]*Id.* at 264.

[124]*Id.* at 266.

[125]Doc. 55 at 23.

[126]Doc. 32-3 at 11.

-24-

The claimant is described by numerous doctors including two neurologists as having Stiff Man Syndrome. He tests positive twice (blood work). There are numerous notes indicating refractory spasms, cramping and poor work performance resulting from these symptoms. Evaluation and testing has excluded other diagnoses. The claimant is described as responding poorly to usual treatment and he is described as suffering from side effects with treatment which include lethargy and sleepiness. A supervisor at work documents his inability to properly perform his duties and gives numerous examples of his impairments that have occurred as a result of Stiff Man Syndrome. Finally, the treating neurologist notes that the claimant cannot work due to refractory symptoms and resultant functional impairment.[127]

In response to this report, Aetna sent Dr. Gordon the following message: "Dr. Gordon please clarify: You found the claimant to be impaired from 12/01/10 through current however; [sic] your report and findings were based on the medical data dated prior to the disability date under consideration of 12/01/10. Please review and comment on the medical data, physical exam findings that demonstrate a functional impairment for the time period under review (12/01/10 through current)."[128]

About one month later, Dr. Gordon submitted a second review in which he states that Aetna's request for "clarification" changed his prior recommendation, and he now concludes that Mason has not shown that he is disabled. Dr. Gordon asserts that "records from earlier periods (early 2010 and before) document more significant difficulties with spasticity, gait impairment and altered mental status," but "the more recent records from 12/1/10 onward do not demonstrate functional impairment from a neurologic perspective."[129] Dr. Gordon did not engage in a peer-to-peer consultation with any of Mason's treating physicians.

---

[127]*Id.*

[128]*Id.* at 14-15.

[129]*Id.* at 15.

### III.  STANDARD OF REVIEW

### A.    The Abuse of Discretion Standard Applies

To determine which standard of review applies in an ERISA benefits case, the court must determine whether the ERISA plan unambiguously grants discretion to the administrator.[130]  "[B]y default, review of denial of ERISA benefits is de novo" and for the administrator "to obtain the more lenient abuse of discretion standard of review, a plan must unambiguously so provide."[131]  Here, the parties agree that the benefit plan at issue gives the administrator, Aetna, discretionary authority to determine benefits eligibility.[132]  The court will therefore review Aetna's determination for abuse of discretion.[133]  Under the abuse of discretion standard, courts consider all of the relevant circumstances and defer to the administrator's decision so long as it is reasonable.[134]  That is, courts defer "to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'"[135]

Determining that the abuse of discretion standard applies "is only the first step" in determining the standard by which courts review an administrator's denial of benefits.[136]  Even where the court must "nominally review for abuse of discretion, the degree of deference" that the court will accord to an administrator's decision can vary significantly

---

[130]*Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1039 (9th Cir. 2014).

[131]*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011).

[132]Doc. 55 at 28; Doc. 59 at 16.

[133]*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[134]*Pac. Shores Hosp.*, 764 F.3d at 1042.

[135]*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Salomaa*, 642 F.3d at 676).

[136]*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008).

depending on the presence of a conflict of interest[137] or procedural irregularities[138] in the record.  Here, on account of the significant conflict of interest and procedural irregularities presented, the court concludes that Aetna's decision is entitled to little deference.

### 1.    Conflict of Interest

"[T]he degree of skepticism with which [courts] regard a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest."[139]  Where an administrator operates under a conflict of interest, that conflict does not alter the standard or review itself, but it "'must be weighed as a factor in determining whether there is an abuse of discretion.'"[140]  In evaluating a conflict of interest, the court must consider not only the terms of the underlying plan and the medical evidence in the record,[141] but also the "nature, extent, and effect on the decision-making process of any conflict of interest" and decide on the record as a whole "how much or how little to credit the plan administrator's reason for denying insurance coverage."[142]  Thus, if all of the other factors are "closely balanced," a conflict of interest "will act as a tiebreaker."[143]

---

[137]*Id.* at 868.

[138]*Abatie*, 458 F.3d at 972.

[139]*Stephan*, 697 F.3d at 929.

[140]*Abatie*, 458 F.3d at 965 (quoting *Firestone*, 489 U.S. at 115).

[141]*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

[142]*Abatie*, 458 F.3d at 967-68.  *See also Salomaa*, 642 F.3d at 681 (Hall, J., dissenting) ("Although this standard's dualism between skepticism and deference may seem strange, it is the proper standard and must be applied carefully.").

[143]*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Mason argues that Aetna operates under a conflict of interest because its behavior is similar to the behavior of the administrators in *Abatie*,[144] *Saffon*,[145] *Montour*,[146] and *Salomaa*.[147]  Those cases are not on all fours, however, because they each involved a disability determination made by the same entity that funded the ERISA plan.  In *Firestone*, the Supreme Court "did not catalogue the full range of types of conflicts of interest, but it suggested that a conflict exists when a plan administrator (which acts as a fiduciary toward the plan participants, who are beneficiaries) is also the sole source of funding for an unfunded plan."[148]  Administrators who operate under this structural conflict of interest have an incentive "to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers."[149]  This specific conflict is not present here because the Plan is self-funded and maintained by FedEx.[150]  Aetna is the Plan's "Claims Paying Administrator"[151] and, in that role, determines eligibility for Plan benefits.[152]

But that is not the end of the story.  Mason also argues that a conflict of interest exists here because "Aetna's contract with FedEx depends on providing favorable

---

[144]*Abatie*, 458 F.3d at 959.

[145]*Saffon*, 522 F.3d at 866.

[146]*Montour*, 588 F.3d at 626-27.

[147]*Salomaa*, 642 F.3d at 674.

[148]*Abatie*, 458 F.3d at 965 n.5 (citing *Firestone*, 489 U.S. at 105).

[149]*Abatie*, 458 F.3d at 966.

[150]Doc. 59 at 3 ¶¶ 3-4.

[151]Doc. 32-6 at 1.

[152]*Id.* at 3.

financial results for FedEx."[153]  Aetna responds by calling this a "scandalous allegation" that is "completely unfounded and not supported by any evidence in the record."[154]

Defendants do not dispute that FedEx pays benefits claims out of its own undedicated funds.  FedEx therefore has an obvious incentive to hire a Claims Paying Administrator that minimizes benefits awards.  According to the Supreme Court in *Glenn*, an employer's own conflict may "extend to its selection of an insurance company to administer its plan."[155]  In fact, it has been noted that "[a] so-called independent administrator may have much more of an incentive to decide against claimants" than either an employer or "an insurance company spending 'its own money.'"[156]  These "independent" administrators may have an incentive to "show how tough they are on claims to better market their services to self-insured employers," whereas insurance companies "may have an incentive to be more liberal than is appropriate because its experience-based premiums amount to a cost-plus contract, such that the more it spends, the more it makes."[157]  Similarly, an employer might "wish to slant its decisions in favor of coverage in close cases" in order to "make working there attractive by means of a reputation for good medical coverage," among other reasons.[158]

It is apparent from the record that FedEx's (and by extension, Aetna's) conflict of interest significantly colored the decision-making process.  Nowhere is this conflict more evident than with Aetna's response to Dr. Gordon's initial finding that Mason is disabled.  Aetna's treatment of Dr. Gordon's disability finding suggests bias for at least five

---

[153]Doc. 55 at 37.

[154]Doc. 59 at 23.

[155]*Glenn*, 554 U.S. at 114.

[156]*Abatie*, 458 F.3d at 977 (Kleinfeld, J., concurring).

[157]*Id.*

[158]*Id.*

reasons. First, Aetna's request for "clarification" misleadingly implies that Dr. Gordon's initial report only considered medical data dated before December 1, 2010.[159] This is not so: Dr. Gordon's report also relies on Mason's second blood test that came back positive for SPS (dated December 7, 2010)[160] and Dr. Downs' June 10, 2011 letter.[161]

Second, Mason asserts and Aetna does not deny that the Plan does not forbid consideration of medical records that predate the date of the claim.[162] It would be illogical for it to do so.

Third, Aetna asked Dr. Gordon to submit a new report, ostensibly because he relied on pre-December 2010 data, but it did not ask the same of its doctors who found that Mason was not disabled, even though they, too, relied on such data.[163] It is unclear why Aetna needed "clarification" from Dr. Gordon, but not Drs. Weinstein or Mendelssohn.

Fourth, the date restriction that Aetna imposed on Dr. Gordon is inconsistent with the scope of records upon which Aetna itself relied. For example, Aetna's initial denial letter references Mason's September 2010 neuropsychological exam, and its final denial letter relies on exam reports from July 16, 2010 and November 24, 2010.

Finally, Dr. Gordon's supplemental report indicates that he was influenced by Aetna's suggestive request for "clarification." Dr. Gordon's second report concludes that "[w]hile records from earlier periods (early 2010 and before) document more significant difficulties with spasticity, gait impairment and altered mental status; the

---

[159]Doc. 32-3 at 15.

[160]*See id.* at 11 (noting that Mason tested "positive twice (blood work)" for SPS); *id.* at 10 ("Anti-GAD antibodies (diagnostic test for Stiff Man Syndrome) are positive (slightly elevated) on 12/7/10 and significantly elevated on 2/24/10 and negative from 7/28/10.").

[161]*Id.* at 11 ([T]he treating neurologist notes that the claimant cannot work due to refractory symptoms and resultant functional impairment.").

[162]Doc. 64 at 31.

[163]*See* Doc. 32-2 at 243-45, 252-256, 259-60.

-30-

more recent records from 12/1/10 onward do not demonstrate functional impairment from a neurologic perspective."[164]  Dr. Gordon does not state what might have changed, from a neurologic perspective or otherwise, that could explain this significant improvement in Mason's condition.  Nor does he attempt to reconcile his conclusion with the conclusion of Mason's treating doctors that Mason's disability was permanent and progressive in nature.[165]

## 2. Procedural Irregularities

"A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."[166]  If the administrator "can show that it has engaged in an 'ongoing, good faith exchange of information between [itself] and the claimant'" and the evidence shows only a minor procedural irregularity, the court should continue to give the administrator's decision broad deference.[167]  If the administrator's "procedural defalcations are flagrant, de novo review applies" and "the court is not limited to the administrative record and may take additional evidence."[168]  Most of the time, the procedural errors "are not sufficiently severe to transform the abuse-of-discretion standard into a de novo standard" and in

---

[164]Doc. 32-3 at 15.

[165]Doc. 32-2 at 160 ("Probable duration of condition: life long"); *id.* at 161 ("[E]stimate the beginning and ending dates for the period of incapacity: permanent"); *id.* at 194 (stating that Mason's SPS "has rendered him permanently disabled."); *id.* at 198 ("I anticipate significant clinical improvement by (date): never."). *See also id.* at 8-9.  These prognoses are consistent with Dr. Meekins' assessment of Mason's SPS as progressive on July 28, 2010. *Id.* at 61. *See also id.* at 172 (Dr. Lord noted on July 29, 2010, that Mason's symptoms have "progressively worsened and his symptoms are currently poorly controlled."); *id.* at 173 (Dr. Lord noted on August 16, 2010, that Mason's SPS had "deteriorated"); *id.* at 188 (Dr. Lord noted on October 28, 2010, that Mason's SPS had "deteriorated").

[166]*Abatie*, 458 F.3d at 972.

[167]*Id.* (quoting *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003)).

[168]*Id.* at 973.

such instances the court must "weigh any procedural errors as a factor in determining whether [the administrator] abused its discretion."[169]

Saffon is instructive. In Saffon the claimant was receiving disability benefits on account of degeneration of her cervical spine.[170] When MetLife, her plan administrator, commissioned a doctor to review her medical records, the doctor determined that the claimant's file lacked "detailed, objective, functional findings or testing which would completely preclude" the claimant's return to work.[171] MetLife forwarded its doctor's report to the claimant's treating neurologist, who then submitted to MetLife a note explaining why the claimant's previous MRI was objective evidence of her cervical pathology. MetLife's doctor was unpersuaded by this submission, and MetLife terminated the claimant's benefits. The termination letter stated that the claimant could appeal this determination by providing, among other things, "objective medical information to support [her] inability to perform the duties of [her] occupation."[172]

Although the claimant submitted additional evidence on appeal, Metlife's second reviewing doctor reached the same conclusion as its first: there was "'not enough objective medical findings and office notes'" showing that the claimant's "'self-reported headache and chronic pain syndrome has been enough to preclude her from' working."[173] MetLife affirmed the termination.

The Ninth Circuit held that MetLife's termination was riddled with procedural errors. It held that MetLife's termination letter was insufficient for at least three reasons. First, although the letter notes that "'[t]he medical information provided no longer provides evidence of disability that would prevent [the claimant] from performing [her]

---

[169]Pac. Shores Hosp., 764 F.3d at 1040. See also Abatie, 458 F.3d at 972.

[170]Saffon, 522 F.3d at 866.

[171]Id. at 869.

[172]Id.

[173]Id. at 869-70.

job or occupation,'" it does not "explain why that is the case, and certainly does not engage [the claimant's treating neurologist's] contrary assertion." Second, although the letter suggests that the claimant can "appeal by providing 'objective medical information to support [her] inability to perform the duties of [her] occupation,'" it "does not explain why the information [she] has already provided is insufficient for that purpose."[174] And third, if MetLife believed that it was necessary for the claimant to present some means for objectively testing the claimant's ability to perform her job, such as a "Functional Capacity Evaluation," MetLife "was required to say so at a time when [the claimant] had a fair chance to present evidence on this point."[175] In addition to these errors related to the notice, the court also faulted MetLife for communicating directly with the claimant's doctors without advising her of the communication and taking "various of her doctors' statements out of context or otherwise distorted them in an apparent effort to support a denial of benefits."[176]

The procedures that Aetna followed in this case are even more flawed that those at issue in *Saffon*.

### a. Aetna's Notices Are Deficient

ERISA plan administrators "must follow certain practices when processing and deciding plan participants' claims."[177] For example, 29 C.F.R. § 2560.503-1 provides that an ERISA plan administrator investigating a claim must engage in "a meaningful dialogue" with the beneficiary.[178] "If benefits are denied in whole or in part, the reason

---

[174]*Id.* at 870.

[175]*Id.* at 871.

[176]*Id.* at 873.

[177]*Abatie*, 458 F.3d at 971.

[178]*Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (citing former 29 C.F.R. § 2560.503-1(f)). The pertinent language is now codified at 29 C.F.R. § 2560.503-1(g).

-33-

for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."[179]

Aetna's March 28, 2011 denial notice analyzes hundreds of pages of Mason's medical records in one paragraph containing a series of disjointed sentences.[180]  Like the notice in *Saffon*, it does not clearly explain to the claimant what was necessary to perfect the claim.  Although Aetna informs Mason that he was required to submit "medical documentation that clearly states the significant objective findings that substantiate [his] disability," such as physician exam reports, office notes, or diagnostic test results such as lab tests,[181] it does not clearly inform him of the specific reasons why its reviewers found that the evidence he already submitted was insufficient.  For example, it does not clearly state that Aetna would disregard his diagnostic test results if they do not contain "consistency or validity testing results."[182]  If Aetna believed that validity testing results were necessary, it was required to say so "in a manner calculated

---

[179]*Booton*, 110 F.3d at 1463.  *See also* 29 C.F.R. § 2560.503-1(g)(1) (requiring, among other things, that notices of adverse benefit determinations must set forth "in a manner calculated to be understood by the claimant:" (i) "[t]he specific reason or reasons for the adverse determination;" (ii) "[r]eference to the specific plan provisions on which the determination is based;" and (iii) "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.").

[180]Doc. 32-2 at 4.

[181]*Id.* at 5.

[182]*See* Dr. Mendelssohn's first report, *id.* at 243-44 ("Dr. Dukarm noted that the claimant appeared lethargic, and the claimant reported having a headache and experiencing pain. There was no indication that formal measures of validity were utilized to ensure valid test results."); *id.* at 245 (rejecting Dr. Dukarm's cognitive disorder diagnosis in part because "there was no indication that the examiner utilized symptom validity measures to ensure adequate effort and motivation and valid test findings."); Dr. Mendelssohn's second report, *id.* at 249 ("[I]n my previous review I questioned the presence of whether the claimant's test performance was reflective of valid test findings.  However, validity could not be determined given that there was no indication that the examiner administered symptom validity measures to ensure optimal effort and motivation and validity of the neuropsychological evaluation.").

to be understood by"[183] Mason at a time when he had a meaningful opportunity to present evidence on this point.

The record is replete with similar examples. Aetna's denial notice does not disclose to Mason that Dr. Mendelssohn discounted his doctors' observations of his emotional and cognitive difficulties because those doctors did not include "specific measurements of [Mason's] cognition or a description of direct and observed behaviors to corroborate the presence of impairment in neuropsychological functioning."[184] Nor does it disclose to him that Dr. Weinstein discounted an exam finding that he had an irregular gait because there was "no documentation of abnormal muscle tone on specific muscle testing or other musculoskeletal or neurologic examination abnormalities."[185] Or that Dr. Weinstein discounted his somnolence complaints because there was "no documentation of pathologic hypersomnolence, difficulty with communication in the office visits, or significant cognitive impairments."[186] Or that Dr. Weinstein found that Mason's file was lacking "documentation of consistently abnormal musculoskeletal or neurologic examination findings."[187] Aetna's failure to disclose these alleged deficiencies to Mason, "a maneuver that has the effect of insulating [its] rationale from review, contravenes the purpose of ERISA."[188]

Further, when Dr. Kim filled out Aetna's "Attending Physician Statement" form, he listed numerous diagnostic test results that, in his opinion, were "objective data" that document Mason's disability, including the lab tests that confirmed Mason's

---

[183]29 C.F.R. § 2560.503-1(g)(1).

[184]Doc. 32-2 at 245.

[185]*Id.* at 255.

[186]*Id.* at 256.

[187]*Id.* 32-2 at 260.

[188]*Cf. Abatie*, 458 F.3d at 974.

-35-

diagnosis.[189]  If Aetna believed that these test results did not contain "significant objective findings that substantiate" his disability, it was required to say so and explain why not.  Aetna's denial letter makes no mention of Mason's lab tests; it vaguely concludes that Dr. Kim "was unable to provide any objective findings or clinical observations to correlate with your subjective complaints due to diagnosis of stiff person syndrome."[190]

### b.    Aetna Failed to Engage in a Good Faith Exchange of Information

In determining the degree of deference to which an administrator is entitled, courts must also consider its course of dealing with the claimant and her doctors.[191]  In *Saffon* the Ninth Circuit chided the plan administrator for only communicating the results of its reviewing physician's findings with the claimant's doctor and not also the claimant herself.  Aetna did substantially worse here by providing none of its reviewing doctors' reports to either Mason or his physicians at any point during the administrative process.[192]  Aetna's initial denial letter fails to provide Mason with even its reviewers' names, identifying them only as "independent peer physicians specializing in internal medicine, neurology, and neuropsychology."[193]  Without any way for his treating doctors to confer with Aetna's doctors, or to submit reports that respond to Aetna's reports, Aetna significantly hindered Mason's ability to develop the administrative record.

---

[189]Doc. 32-2 at 198.

[190]*Id.* at 4.

[191]*Saffon*, 522 F.3d at 873.

[192]Doc. 55 at 36.

[193]Doc. 32-2 at 4.

Defendants argue that Mason had no right to review and rebut its peer review reports "generated during the appeal process."[194]  Even assuming this is true, Defendants confuse the issue.  The problem is not that Aetna failed to disclose to Mason the reports that Drs. Mazal, Schnur, and Gordon generated during the appeal process, but rather the reports from Drs. Weinstein, Mendelssohn, and Cohan upon which Aetna relied when it initially denied Mason's claim.[195]  The Ninth Circuit has held that where an administrator does not give the claimant, her attorney, or her physicians access to the medical reports of its own physicians upon which it relied, this violates the claimant's statutorily right to a "full and fair" review of the denial.[196]

What is more, Aetna even failed to provide its own reviewers with pertinent records.  As Mason observes, Aetna failed to provide Dr. Weinstein or Dr. Mendelssohn with any records from his treating psychologist, Dr. Madden.[197]  Defendants dispute this, and assert that "Dr. Mendelssohn's report specifically states that Dr. Mendelssohn reviewed at least fourteen medical notes from [Dr. Madden].  Dr. Mendelssohn also commented on these records directly in her report."[198]  This is false.  Defendants support their factual assertions with a citation to Aetna's March 28, 2011 denial letter,

---

[194]Doc. 73 at 8 (citing *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009); *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007); *Warming v. Hartford Life & Acc. Ins. Co.*, 663 F. Supp. 2d 10, 20 (D. Me. 2009); *Winz-Byone v. Metro. Life Ins. Co.*, No. EDCV 07-238-VAP, 2008 WL 962867, at *8 (C.D. Cal. Mar. 26, 2008)).

[195]*See Metzger*, 476 F.3d at 1166 (holding that although plan administrators must release documents relied upon during the initial benefit determination, they need not release "documents generated during the appeal process itself."); *Midgett*, 561 F.3d at 896 ("[T]he full and fair review to which a claimant is entitled under 29 U.S.C. § 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers *solicited on that same level of appeal*.") (emphasis added).

[196]*Salomaa*, 642 F.3d at 679 (citing 29 U.S.C. § 1133).

[197]Doc. 32-2 at 247-48.

[198]Doc. 73 at 7.

not Dr. Mendelssohn's reports.[199]  Neither of Dr. Mendelssohn's reports state that she reviewed any records from Dr. Madden[200], and Dr. Mendelssohn does not comment on any of Dr. Madden's records in either of her two reports.[201]

This particular deficiency was likely significant to Dr. Weinstein's and Dr. Mendelssohn's findings.  Dr. Mendelssohn concludes that none of the records that Aetna provided her show that Mason "was falling asleep during his office visits nor did the provided information include . . . description [sic] of overt cognitive difficulties."[202]  Similarly, Dr. Weinstein states that "there has been no documentation of pathologic hypersomnolence, difficulty with communication in the office visits, or significant cognitive impairments."[203]  If Drs. Weinstein and Mendelssohn had been provided with Dr. Madden's records, they would have learned that for each of Mason's 14 visits with Dr. Madden, spanning approximately six months, Dr. Madden's mental status exams noted that Mason was "lethargic."[204]  Had they followed up with Dr. Madden about what she meant, Dr. Madden would have likely informed them that Mason was "very tired" during his therapy sessions and had fallen asleep "despite a valiant effort to stay awake."[205]

---

[199]Doc. 32-2 at 4.

[200]*Id.* at 241-42, 247-48.

[201]*Id.* at 241-46, 247-50.

[202]*Id.* at 249-50.

[203]*Id.* at 256.

[204]*Id.* at 63, 66, 72, 81, 83, 88, 91, 94, 97, 103, 106, 110, 113, and 117.

[205]*Id.* at 13.  Although Defendants correctly note that Dr. Schnur was provided with Dr. Madden's records, he made no findings regarding the side effects of Mason's medications, stating that he lacked necessary expertise to do so.  Doc. 32-3 at 6.

-38-

Finally, Aetna's physicians erred by not engaging in peer-to-peer consultations with Mason's physicians to resolve perceived ambiguities in Mason's records.[206]  For example, Dr. Weinstein noted that Dr. Lord observed Mason in "moderate pain and distress," but discounted this finding because Dr. Lord provided "no details of specific observations."[207]  Yet Dr. Weinstein's report does not indicate that she contacted Dr. Lord to obtain more details about what he observed, despite the fact that Dr. Lord invited Aetna to contact him with "any further concerns or questions."[208]  Similarly, Dr. Mendelssohn noted that Dr. Dukarm observed that Mason "appeared lethargic" during his neuropsychological test, yet she discounted this observation because "more specific description [sic] was not included."[209]  Dr. Mendelssohn's report does not indicate that she contacted Dr. Dukarm to obtain clarification of what he specifically meant by "lethargic."  The Ninth Circuit's description of Aetna's efforts in *Booton* is equally apt here: "Lacking necessary- and easily-obtainable information, Aetna made its decision blindfolded."[210]

## B.    A Bench Trial on the Record Would be Improper

The parties dispute whether the proper vehicle for determining Mason's benefit claim is a "bench trial on the record" followed by a judgment that complies with Rule 52 or summary judgment under Rule 56.  Relying on *Kearney v. Standard Insurance Company*,[211] Mason argues that "the proper procedure in ERISA cases involving the

---

[206]The only Aetna physician that reached out to one of Mason's treating physicians was Dr. Cohan, but this was not a true "peer-to-peer" consultation because Dr. Cohan, a neurologist, inexplicably did not consult with Mason's neurologists but instead Dr. Kim, a general practitioner.  Doc. 32-2 at 265.

[207]*Id.* at 260.

[208]*Id.* at 172.

[209]*Id.* at 249.

[210]*Booton*, 110 F.3d at 1463.

[211]175 F.3d 1084 (9th Cir. 1998) (en banc).

review of the denial of benefits is a 'trial on the record.'"[212]  Mason asserts that, "[s]ince *Kearney*, the Ninth Circuit has reaffirmed [that] a 'trial on the record' is the correct approach" in *Thomas v. Oregon Fruit Products Co.*[213]  Under this approach, Mason argues, the court can "decide what the facts are."[214]

Mason is essentially seeking to transform this abuse-of-discretion case into one involving de novo review.  But, because the cases upon which his argument relies involve de novo review, his argument misses the mark.[215]  It is true that in ERISA cases decided under the de novo standard courts may conduct trials on the record.  This is because those courts are tasked with evaluating evidence and making credibility determinations anew.[216]  Such trials are not appropriate in abuse-of-discretion cases, however.  As the Ninth Circuit explained in *Bendixen v. Standard Ins. Co.*, "it is important to keep in mind that the remand and reversal of the summary judgment in [*Kearney*] depended upon the application of de novo review by the district court."[217]  In

---

[212]Doc. 55 at 2.

[213]228 F.3d 991, 996 (9th Cir. 2000) ("*Kearney* clarifies that participants and beneficiaries claiming benefits under ERISA are not entitled to 'full trial[s] de novo' because such trials would undermine the policies behind ERISA.  Rather, *Kearney* created a 'novel form of trial,' in which the district court, subject to its discretion to consider additional evidence under limited circumstances, is to conduct 'a bench trial on the record.'") (citing *Kearney*, 175 F.3d at 1094, 1095 & n.4).

[214]Doc. 64 at 2.

[215]*See Kearney*, 175 F.3d at 1095-96; *Thomas*, 228 F.3d at 994 ("As in *Kearney*, the district court should have reviewed Thomas' claim de novo."); *O'Neal v. Life Ins. Co. of N. Am.*, 10 F. Supp. 3d 1132, 1135 (D. Mont. 2014).  *But see Tapley v. Locals 302 & 612 of Int'l Union of Operating Engineers-Employers Const. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013) (the district court conducted a trial on the record despite the fact that the abuse of discretion standard of review applied).  Because the Ninth Circuit did not address the propriety of the district court's procedural choice on appeal and, in any event, reversed the court's judgment, *Tapley* is not binding authority on this issue.  *Id.* at 1139-43.

[216]*Kearney*, 175 F.3d at 1095.

[217]185 F.3d 939, 942-43 (9th Cir. 1999) (overruled on other grounds by *Abatie*, 458 F.3d at 965).

-40-

cases where the abuse of discretion standard applies, whether the administrator abused its discretion is a question of law, not fact, based on a review of the administrative record, as opposed to a trial.[218]  Because a motion for summary judgment is "the conduit to bring [that] legal question before the district court,"[219] Mason's motion for a post-trial judgment under Rule 52 will be denied.

**C.    Summary Judgment Principles Have Limited Application**

Because of the limited nature of review, "[t]raditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard."[220]  Thus, "the usual tests of summary judgment, such as whether a genuine dispute of material fact exists," generally do not apply.[221]

## IV.  DISCUSSION

**A.    FedEx Trade Is Not a Proper Party**

Defendants argue that Mason's employer, FedEx Trade, is not a proper party to this action because it is only a "Controlled Group Member" and "Sponsoring Employer," and it does not exercise any control over the plan as an administrator or otherwise.[222] In *Cyr v. Reliance Standard Life Ins. Co.*, the Ninth Circuit held that "liability under 29 U.S.C. § 1132(a)(1)(B) is not limited to a benefits plan or the plan administrator,"[223] but did not define the precise limitations of ERISA liability.  In *Spindex Physical Therapy v. United Healthcare of Arizona*, the court provided some guidance: "proper defendants under § 1132(a)(1)(B) for improper denial of benefits at least include ERISA plans,

---

[218]*Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009).

[219]*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)

[220]*Stephan*, 697 F.3d at 929.

[221]*Nolan*, 551 F.3d at 1154.

[222]Doc. 59 at 16-17.

[223]642 F.3d 1202, 1207 (9th Cir. 2011).

-41-

formally designated plan administrators, insurers or other entities responsible for payment of benefits, and de facto plan administrators that improperly deny or cause improper denial of benefits."[224]

Mason responds by stating that he is not pursuing a § 1132(a) claim against FedEx Trade, but rather a claim that arises under § 1132(c) for FedEx Trade's violation of 29 U.S.C. § 1024(b)(4) and 29 C.F.R. § 2560.503-1(h)(2)(iii).[225] This argument fails because, as Defendants point out, § 1132(c) actions may only be brought against plan administrators.[226] Mason does not dispute that FedEx Trade is not the Plan's administrator. Summary judgment will be granted in FedEx Trade's favor.

**B.  Aetna Abused Its Discretion**

The court finds that, based on the record that Aetna had before it, Aetna abused its discretion in denying Mason's claim. The evidence in the record shows that Mason suffers from a permanent disability that prevents him from working. Aetna's conclusion to the contrary is illogical, implausible, and not supported by the facts.

**1.  Evidence of Mason's Medical Conditions**

As noted above, the fundamental basis of Mason's claim is his contention that he can no longer work because he suffers from a combination of (1) painful spasms and (2) the negative side effects from the medication he takes for those spasms.

**a.)  SPS Symptoms**

There is ample objective evidence in the record showing that Mason suffers from painful spasms, including Mason's blood tests that came back positive for SPS and exam notes that show Mason has been repeatedly observed suffering from symptoms

---

[224]770 F.3d 1282, 1297 (9th Cir. 2014).

[225]Doc. 64 at 27.

[226]29 U.S.C. § 1132(c) ("Any *administrator* . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary . . . .") (emphasis added).

typical of this disease: spasms, pain, and stiffness.[227]  Mason's April 27, 2011

emergency department physical exam notes, for example, state that Mason's

extremities were stiff and he was suffering from painful spasms.[228]  And his May 11,

2011 emergency room notes state that Mason was observed suffering from "severe"

"whole body spasms."[229]  Contrary to Aetna's conclusion, these are "objective findings"

that substantiate Mason's self-reported symptoms.

Inexplicably, both of Aetna's denial notices fail to mention Mason's positive lab

results.  Aetna's final denial notice also does not connect his spasms with his SPS

diagnosis, stating only that the data show that Mason "had stiffness and muscle

pain."[230]  Although that notice does summarize the two emergency room records

mentioned above, Aetna distorts their significance and omits reference to relevant facts

in an apparent effort to support a denial.  The only aspect of Mason's April 27

emergency department notes that Aetna mentions is that they do not "reveal any

neurological defects."[231]  And with regard to Mason's May 11 emergency department

notes, Aetna states only that they show Mason "had stiffness and muscle pain," but his

"motor power and sensation were normal."[232]  Aetna selectively ignores the objective

evidence that shows Mason was suffering from painful spasms.  Selective consideration

of evidence is a hallmark of arbitrary and capricious decision-making.[233]

---

[227]See, e.g., Doc. 32-2 at 23, 49, 56, 163, 173.

[228]Id. at 36.

[229]Id. at 23.

[230]Doc. 32-1 at 1.

[231]Doc. 32-1 at 2.

[232]Id.

[233]See Glenn, 554 U.S. at 118 (holding that selective consideration of evidence is a proper grounds for setting aside an administrator's decision); Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 777 (7th Cir. 2010).

-43-

### b.) Medication Side Effects

Aetna does not dispute that Mason's medications can potentially cause side effects of sedation and cognitive impairment; it does dispute that Mason was in fact suffering from them.[234]  But, again, Aetna selectively ignores evidence in the record.

Ample evidence in the record shows that Mason's medication had a sedative effect, including all 14 visit notes from Dr. Madden, various visit notes from other doctors,[235] notes from Dr. Kim,[236] Dr. Madden,[237] and Dr. Grant,[238] and Combs' email. Aetna's final denial letter mostly fails to mention this evidence.  It does mention Dr. Madden's November 24, 2010 office visit note, but selectively omits Dr. Madden's description of Mason's consciousness as lethargic,[239] and instead focuses solely on Dr. Madden's other observations that do not support a disability finding.[240]  Aetna's initial denial letter concludes that there is no objective proof that Mason suffers from

---

[234]*See* Dr. Cohan's report, doc. 32-2 at 266 ("Although the claimant does take medications which have potential adverse side effects, including sedation, nevertheless there is no objective data in the medical records provided to substantiate that the claimant has experienced those adverse medical side effects.").

[235]*See* Dr. Dukarm's report, doc. 32-2 at 75 ("His affect appeared obtunded . . . .  The patient appeared lethargic . . . ."); Dr. Downs' April 29, 2010 note, *id.* at 148 ("His attention span and concentration are slightly reduced, and he appears somewhat somnolent."); Dr. Lord's May 5, 2010 office note, *id.* at 150 (physical exam describes Mason as "fatigued"); Dr. Lord's May 7, 2010 office note, *id.* at 152 (same); Providence Alaska Medical Center's January 11, 2011 emergency report, *id.* at 48 ("He did take diazepam and Zanaflex that has improved his symptoms.  When he initially checked in, his pain [was] 9/10.  Currently, he has minimal pain and is sleeping."); *id.* at 49 ("He is sleeping upon my arrival into the room, which was about 20 minutes after presentation.").

[236]Doc. 32-2 at 196, 198.

[237]*Id.* at 13.

[238]*Id.* at 121.

[239]*Id.* at 94.

[240]Doc. 32-1 at 1 (noting only that Dr. Madden described Mason's mood as depressed, his thought process as normal and coherent, his language as intact, and his speech as spontaneous).

somnolence because it focuses only on the notes from Dr. Kim and Dr. Grant, which, according to Aetna, did not "document any objective findings to indicate a functional impairment such as significant sleepiness or disorientation during office visits."[241] Not only does this conclusion ignore the contrary evidence in the record noted above, but also ignores an explanation for why Dr. Kim and Dr. Grant did not observe Mason's sleepiness. Both Dr. Madden and Dr. Kim stated that Mason did not take his medication before his doctors' visits so that he could be awake and alert enough to communicate, understand, and remember what was going on.[242]

Dr. Dukram's neuropsychological test is also objective evidence that Mason suffers from a cognitive disorder. Over the course of this four-hour exam, Dr. Dukram subjected Mason to a litany of tests,[243] the results of which led him to conclude that Mason was exhibiting "variable neurocognitive performance deficits in the areas of executive functioning" and diagnosed him with "Cognitive Disorder, NOS."[244] Aetna's final denial letter does not even mention these tests. Aetna's initial denial letter does mention them, but only to discount their medical significance based on dubious factual grounds[245] and naked speculation that Mason might not have been putting forth his best effort during the exam.

---

[241]Doc. 32-2 at 4.

[242]*Id.* at 13, 265.

[243]*Id.* at 75.

[244]*Id.* at 77.

[245]Although Aetna concludes that Dr. Dukarm did not note "significant sedation" during testing, Dr. Dukarm described Mason as "lethargic" and his affect "obtunded." Aetna's interpretation of Dr. Dukarm's remarks is questionable.

## 2. Evidence of Mason's Disability

As Defendants point out, just because someone has a medical condition does not by itself establish disability.[246] Sometimes the person's medical conditions are so severe that the person cannot work, but other times "people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions."[247] There is ample evidence here, however, that shows that the combined effects of Mason's conditions are severe enough to prevent him from working as a manager for FedEx Trade.

Dr. Lord, Dr. Kim, and Dr. Grant each concluded that Mason is unable to work on account of his medical conditions. Aetna's denial notices do not consider these significant opinions, let alone explain why these three treating physicians got it wrong. Aetna also failed to consider Mason's SSDI award as evidence of his disability. "Social Security disability awards do not bind plan administrators, but they are evidence of disability. Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion. Weighty evidence may ultimately be unpersuasive, but it cannot be ignored."[248]

Finally, Aetna failed to consider the only evidence in the record regarding Mason's actual performance at work: Combs' email. In her email Combs states that Mason fell asleep on the job "many times," had difficulties focusing and remembering things, and had become a "grave liability" for the company. Aetna's two denial notices completely ignore this probative evidence.

---

[246]*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004).

[247]*Id.*

[248]*Salomaa*, 642 F.3d at 679. *See also Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008).

Before receiving Combs' email, Drs. Mendelssohn and Weinstein each concluded that the side effects of Mason's medications must not have been so bad because he was still able to work.[249]  But, when Aetna presented Combs' email to Drs. Mendelssohn and Weinstein, showing otherwise, each doctor's opinion remained the same.  Dr. Mendelssohn dismisses Combs' description of Mason's troubles at work as not credible for dubious reasons, including her incorrect findings that the record contained "no indication that [Mason] was falling asleep during his office visits"[250] and that there were no medical findings that Mason suffers from "overt cognitive difficulties."[251]  Dr. Weinstein's second report is even less defensible.  After providing Dr. Weinstein with Combs' email, Aetna asked her whether "the clinical data correlate[s] with the symptoms exhibited at work to support an inability to perform his job functions."[252]  It appears that Dr. Weinstein did not even read Combs' email because her response begins: "It is not clear what symptoms were exhibited at work . . . ."[253]  Instead of asking Dr. Weinstein to clarify her answer, as it did with Dr. Gordon, Aetna simply accepted her response.

---

[249]Doc. 32-2 at 245 (Dr. Mendelssohn's first report states, "It was opined [on Dr. Dukarm's report] that the claimant's cognitive difficulties were multifactorial in nature secondary to medications, pain, sleep disturbance, and depression.  However, it is important to note that the claimant continued to work despite findings from this evaluation."); *id.* at 255-56 (Dr. Weinstein's first report discounts Mason's SPS symptoms because he had been suffering from them "for over 15 years and this has not precluded him from working."  It also discounts Dr. Dukarm's findings because, "[d]espite the fact that this study was done on 9/27/10, it appears the claimant was still able to perform his own occupation with the first date of absence being listed as 11/10/10.").

[250]*Id.* at 250.

[251]*Id.*

[252]*Id.* at 260.

[253]*Id.*

-47-

**V.  CONCLUSION**

For the reasons set forth above, Plaintiff's motion at docket 55 for judgment pursuant to Rule 52 is **DENIED**.  Summary judgment is **GRANTED** in favor of FedEx Trade Networks Transport & Brokerage, Inc.  In all other respects, Plaintiff's motion for partial summary judgment at docket 55 is **GRANTED,** and Defendants' cross-motion for partial summary judgment at docket 57 is **DENIED**.  Defendants are hereby **ORDERED** to grant Plaintiff's claim for short-term disability benefits.

DATED this 22nd day of February 2016.

/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE